Good morning. May it please the Court, my name is Tom Babel from the law firm of Ward and Smith, and to my right is Corey Reese from the law firm of Shipment and Write, and to the right of him is my law partner Michael Miller from the firm of Ward and Smith, and we're here on behalf of the appellants. We would like to respectfully reserve five minutes for rebuttal, and if it helps the Court, Mr. Reese and myself have split up our argument. I'm going to be addressing the interpretation of the plan, as well as the evidence of manifestation of intent by the parties. Mr. Reese will address the estoppel argument, as well as the post-judgment motions, if that helps the Court. I mean, you can boil down this case to a simple argument on behalf of the appellees, the plaintiffs in the case. It's what they would like you to read, this Amendment 1, to mean that accrued benefit equals normal retirement date. So every time you look in the plan document, which, as the Court knows, you have to read it just like a contract, every time you see accrued benefit, you see the term normal retirement date. That's not true. Accrued benefit is the starting point when you determine the amount of a benefit provided in the plan for the participants. That's where you start, and then you need additional information. You need the benefit commencement date, as well as whatever benefit that the participant chooses. And if you look at the plan, if you accept their argument, you would be reading surplishes or conflicts into the plan document, which we're not permitted to do. For instance, if you take a look at, I think it's 4.2 of the plan document, this would be deferred normal retirement. If you read under that definition, it actually states that a participant gets his or her accrued benefit at his or her normal retirement date, and then it goes on to give you some additional definition. Well, according to the appellees, you don't need that additional phraseology. You could have stopped just right on accrued benefit. So if you accept their argument, you'd have to read into the particular plan additional words. I mean, if you go just simply to the definition section of the plan document, you don't need normal retirement date to be defined according to appellees because you've got accrued benefit. Accrued benefit equals normal retirement date. In fact, it does not. And if you go on and look to the manifestation of the party's intent, the experts at Transamerica, this is what these folks do every day. They're actuaries or they're professionals in this particular industry. That's how they read the amendment. They read the amendment the exact same way that we've argued from day one. Who's they? The employees at Transamerica. Well, but isn't there at least a conflict in the record as to certain employees just being directed by someone to do something without really any understanding about the interpretation of the plan? Well, the appellee's position is that Mr. Lum was the one. He was kind of the poisonous tree that this whole thing started from. Their position is Mr. Lum is the one. He's the only one that read the amendment, and he's the one who drafted this internal summary document that all these other employees used. But if you actually look at the record that we pointed out in our briefs, the deposition transcript from Mr. Lum, that's not what he said. What Mr. Lum said is that these are peer-reviewed teams, and each team had different obligations as part of this entire project. And one thing we did point out, and I think in our reply brief, that... So what were they peer-reviewing? Excuse me? What were they peer-reviewing? They were peer-reviewing each other's work. That's by definition what a peer-review is. You would take... Right. So what does that have to do with interpreting the plan provisions? Aren't they just crunching the numbers based on the directions they got? No, because there is no evidence that these particular individuals in these different silos, is the term I would use, did not read that particular amendment one. The appellee's argument is there's no evidence they did read it. We believe there is evidence. For instance, Ms. Katz, who was Mr. Lum's boss, was... In the interrogatory responses provided by the appellees, they admitted that Ms. Katz was provided a copy of amendment one on the same day that there was an email exchange between Ms. Katz and Mr. Lum, and I believe a Mr. Kong. And what they were trying to do is they were... Mr. Kong is the one, his team is the one who came up with this benefit calculator, is the term I would use, and this Excel spreadsheet, which was used to kind of back up this benefit calculator. And they were having a problem, because every time they put in an individual who didn't qualify for early retirement, in early retirement, all of our clients qualified for it, which means they can get their benefit as of October 1, 2013, which is the benefit commencement date. There was a problem, because if you used an employee that didn't qualify for early retirement, they were getting a zero factor, because they didn't qualify, they couldn't get it. And so there's an exchange here where Ms. Katz, who does have a copy of the amendment, and it's a Ms. Kong asked the question, and this is on page 441 of the record. She asked the question, is that going to give some enhanced package, or should they defer the BCD, which is the benefit commencement date, to NRD, that would be normal retirement date, like regular TV? The response from Mr. Lum is, the plan was amended to offer an immediate lump sum in normal form annuity, even if they're not retirement eligible. So he's saying, yeah, look, if you're not early retirement eligible, you still have a right to get a benefit automatically on October 1, 2013. Well, Ms. Katz then gives an equation as to, she thinks she's fixed it. She thinks she's fixed why there's a zero factor for these individuals that don't qualify for early retirement. And she says, she gives the equation, and then she says, or would we miss out on including the ERF, which is early retirement factor, subsidy in these values? And so what she's asking is... How does all this help your case? Because even if we were to construe your argument as all these folks were pursuing a calculation of benefit as you represent they should have for your clients, but on the face of the plan, the plan is not ambiguous, what difference does it make? Because the plan has to be interpreted and the plan has to be applied as the plan is written. I would agree with you, Your Honor. And that's exactly what these folks did. They were reading the plan. They were interpreting it the exact same way that we're arguing it should be interpreted. Right. But if that interpretation is contrary to the terms of the plan, what difference does it make? Because it's a manifestation of the party's intent. The parties that drafted this particular amendment. These are the folks that drafted it. Transamerica drafted it. The lawyers on behalf of Transamerica. Excuse me? Is it your argument that this evidence indicates that that's what the plan provided? Yes, ma'am. Absolutely. So if we should conclude that the plan doesn't provide that, where are you? Well, I think if you rule in that, our position would be if that's the ruling from this particular court, it would be going against the intent of the parties who drafted this particular plan. These are the folks that drafted it. But we look at the plan documents, right? Yes, ma'am. So if we determine that the plan documents don't say that, then what is our holding? Don't you lose then? I believe so. We would lose. If you read the plan document as the trial court did, which we can talk about, because I believe the trial court was confused on one really important particular issue, which, unfortunately, I didn't pick up until preparing for this argument. We would have put it in our brief if we did. Yeah, we would lose. But going to that point, if you look at what the trial court did, the trial court, I believe, was confused. It got confused by kind of the convoluted argument that the appellees were making on how you need to interpret it, this particular amendment. And if you look, when the trial court was going through and telling us why we were wrong, we always used Mr. Bryant as an example because we had all of his forms. And what she said was, well, look, this is why you're wrong. This is why the first calculation of Mr. Bryant's lump sum was incorrect. It's because they used a BCD date of October 1, 2013. Well, that's really important because implicitly what the court is saying is if you don't use that, you cannot use October 1, 2013 as his BCD date if you're going to get a calculation that supports the appellee. Well, interesting, as you know, in the briefs filed by the appellees, they now admit that the benefit commencement date for the lump sum distribution was October 1, 2013. So they basically just gave us the fact or the admission that the trial court needed to rule in our favor because that's what she was saying. She was saying, look, this is where the mistake, this is where you're wrong because you're using the same BCD date, October 1, 2013, as the different annuities that were provided for these clients. I believe it's on page 19 or 20 of, I believe it's 19 of her ruling. And where do the appellees say that the district court was incorrect? I don't believe, they're not stating they're incorrect. They just told me that they've admitted that the premise for the district court's order is factually incorrect. Because when they admitted in the briefing to this court. Where? In their brief. That's what I'm asking you. Where did they admit that? I mean, I don't. Give me a moment, Your Honor. Your Honor, I apologize, it's not jumping on me right now. Did you reserve some time for rebuttal? We did. Maybe you can find it. I know we cited in our reply brief the exact citation in the brief. I believe I'm out of time. Who represents Mr. Smith? Mr. Reese does. Okay. Thank you very much. Thank you. We'll hear from you in rebuttal. It please the Court, I'm Corey Reese and I represent Mr. Smith. I'm here to make two points to the Court today. The first is that the Court erred in granting summary judgment in favor of the plaintiffs on the defendant's equitable estoppel defense. And two, that the Court granted a remedy that was not equitable as it was required to be under equitable rescission. Equitable estoppel is a defense where a fiduciary makes affirmative misrepresentations. It's undisputed here that there were affirmative misrepresentations made to these defendants. In fact, the District Court held that this breached the plaintiff's fiduciary duties to the participants. The issue is whether, and the District Court found, that the defendants failed to meet the four traditional prongs of an equitable estoppel defense. We contend, Your Honors, that, in fact, the defendants did meet each of those prongs. First, the plaintiffs knew the true facts. They knew, if you listen to, according to their version of events, they knew what they intended to, for Amendment 1, to accomplish. And, therefore, they are charged with that knowledge. The Transamerica also clearly intended the defendants to rely on those representations to the defendants by providing them a web tool. Excuse me. I just want to tell you that your time up there is not right. That you have, as I understand it, you have five minutes, right? That would be correct, Your Honor. Not 18 minutes. All right. I'll do my best to figure out where I am. The second person that's the appellant, not to the appellee. So just so you know that. Yes, ma'am. Thank you. We're fixing it all for you. Okay. Okay. Clearly, they intended our clients to rely on the representations they were making about the calculations of their lump sum benefits because they were intending to induce them to take retirement. The defendants, there's no evidence that they were anything but ignorant of the true facts, in other words, what Transamerica apparently intended other than what it had represented. And the defendants, all the evidence shows that the defendants relied on those misrepresentations. They have to rely to their detriment, right? They do. They have to have some concrete, specific harm that they incurred because of this. Right, Your Honor. And each of these defendants, Your Honor, showed that they incurred injury by making an election for a lump sum on the false premise that they would realize a certain benefit. Weren't they given an opportunity to retract that and take the stream of payments instead once the error was disclosed? They were provided a second election form, Your Honor, that also misrepresented the relative value of the lump sum that they were being offered a second time. And didn't DAK correct that shortly thereafter? Sometime in December, I believe. There may have been a letter that went through. But they still had time to do that, right? I'm sorry, Your Honor? They still had time to elect to do that with the corrected information? They could have elected to, well, the first form was invalid if the misrepresentations were made, Your Honor. Right, but in terms of the last one, couldn't they have elected that, gotten what DAK claims is the correct benefit and avoided any excess tax? They would have returned the funds, yes, Your Honor, but they would have, Your Honor, yes. They could have. Okay. But they would have realized less than the full value of their accrued benefit. What they had signed on for was 100 percent relative value of their accrued benefit. In the case of Mr. Smith, for example, he clearly gave up a job that he was offered to transfer to a DAK facility in South Carolina, which would have come with further benefits and salary. But Mr. Smith appears to fit into a separate category from all the other plaintiffs. Yes, Your Honor. He does in this regard. His evidence is a little bit clearer as to the type of damage that he sustained. Is it undisputed or is that an issue that would have to be tried to a jury as to the authority of the individual who offered him employment? Your Honor, we contend it's undisputed. The only evidence that they put forth as to whether or not the person who made the offer was authorized was of Mr. Seals, who said he couldn't remember whether or not he had authorized the gentleman to make a, quote, formal offer. The affidavit that he offered, though, didn't say what. What evidence, though, proves that, I forget the gentleman's name, the supervisor that made the affidavit, that he had the authority to do that? Well, he was the supervisor of control systems who, in its unrebutted, had the authority, the hiring and firing authority at that facility for positions that Mr. Smith would have filled. He also, it's undisputed, advertised those positions himself and then withdrew the advertisement in order to reserve those jobs specifically for employees like Mr. Smith at the DAC facility in North Carolina. Well, the district court said that that was speculative because this gentleman, who was the manager, his employment was terminated later and that the court deemed it too speculative to make a triable issue. But if we deemed it a triable issue, why wouldn't that be a disputed material fact that would require a jury to determine it? Well, Your Honor, I believe that the record reflects that Mr. Smith turned down the job in August. The gentleman who had offered it to him left sometime in September. Well, there's no evidence about the timing of when would the job be effective and that sort of thing. That's true, but neither is there any evidence from Transamerica or the plaintiffs that they would not have honored the offer that was made to Mr. Smith. The question is whether or not his reliance was reasonable and to his detriment. He certainly had a right, we believe, to rely on the offer that was made to him, if he wanted to take it. He did not want to take it, given that he was being offered a generous retirement package or a retirement package that had X dollar value, which Mr. Smith repeatedly investigated and inquired about while making his decision whether or not to accept an alternative job at DAC in South Carolina rather than retire. What he lost under the district... But if Mr. Smith is entitled to recover, is it under equitable estoppel or is it under surcharge? It's under equitable estoppel, Your Honor. We contend. You're sure? Well, he also has a surcharge counterclaim, sir. I think both would work, Your Honor. I think that he could recover under surcharge and equitable estoppel. We believe that he meets all of the elements, traditional elements of equitable estoppel, and we think that he certainly would meet any additional elements that Transamerica would like this court to adopt from other circuits. We don't anticipate that the court should do that. But under the circumstances, he was as diligent as could be on behalf of himself and others. He was inquiring about the accuracy of the information that was being provided to all of them for the purpose of having them decide whether or not to go ahead and retire or do something else or take a lump in Mr. Smith's case or take a stick with their annuity. Now, additionally, Your Honors, the court's order had to do equity. It had to put the both parties. I'm sorry, Your Honor. Thank you. Oh, thank you. Thank you. Mr. Delaney, could you start with the statement of your colleague that the entire premise of the district court's order regarding the start date for calculating the lump sum annuity was incorrect and that you conceded that in your brief? Is that right? Absolutely, Your Honor. No, it's not correct. Absolutely it is right? It is absolutely not correct. Oh. There was no such concession. You mean absolutely you'll start by answering Judge Diaz's question? Sorry, Your Honor. There was no such admission. Let me just be clear. And I think there's a scrambling of the egg that's going on here. Can you talk a little louder? Yes, Your Honor. I apologize. I believe that there's a bit of a scrambling of the egg that's going on here in that there is no dispute that the lump sum payment was paid out in the October 2013 timeframe. The early retirement annuity for at least these specific retirees, these participants would as an annuity have started on their early retirement date. That is the date of their termination. Where the egg is getting scrambled is that the early retirement annuity is a monthly annuity. It's just that. It's the early retirement benefit they would get in the form of a monthly annuity. What the issue here is the lump sum payment that never existed. Yes, Your Honor. I don't want to interrupt your flow, but it might be, whether now or later, it might be useful if you could walk us through Amendment 1 and the plan as to how you see the definitional structure supporting your position and that of the district court. You work it in as you want to, but that would be helpful. It's a great jumping off point, Your Honor, because it's important to remember that the plan did not provide in its own terms for a lump sum benefit. The only thing the plan provided was a normal retirement benefit, that is, at age 65, you begin to receive a monthly pension annuity, $1,500 a month, $2,000 a month, whatever the case may be. There's also early retirement provisions in the plan that provide under certain circumstances, you may retire early. You can retire early and get your accrued benefit, but you have two choices. You can wait to get that accrued benefit until you're age 65, or you can take it early in the form of an annuity, but it's subject to certain reduction factors because you're taking it early. So those are the annuity circumstances. And there's a third here in that the plan provided that for certain retirees with certain age and years of service, they could retire early and get the annuity at the early retirement date unreduced by the early retirement reduction factors. All of this has to do with annuities. Nowhere in the plan does there exist, until Amendment 1, a lump sum benefit. So the question becomes, what is the lump sum benefit calculated based on? Is it calculated based upon the cost value of the normal retirement benefit annuity, or is it based upon the cost value of the early retirement benefit annuity? I think I might counsel that there are Treasury-like regulations that allow you to treat the early retirement lump sum or maybe the normal retirement lump sum differently than you would under the normal annuity plan in the plan. The regulations basically say, Your Honor, that you have a choice to do it whichever way you want. You can pay the lump sum unsubsidized, which means you're calculating the lump sum based upon the normal retirement annuity at the normal retirement date, or you can calculate the lump sum based upon the early retirement annuity. And the difference is, obviously, if you're going to take a lump sum cost equivalent of a monthly benefit, say $1,500, that doesn't start until 15 years from now, the cost equivalent of that benefit today is lower. The value of that benefit that's not going to be paid out until 15 years from now is lower than if you took the cost equivalent of a benefit that was immediately payable, the early retirement benefit. And the Treasury regulations you're referring to, Your Honor, give the plan and confirm that the plan can do it either way. And that's what's called a subsidized lump sum, meaning you're giving them the benefit of the early retirement annuity, you're calculating it essentially early in the lump sum, or unsubsidized, which is what this plan intended by Amendment 1. And the way we get there, Your Honor – So your position is that what the Treasury regulations permit is what Amendment 1 adopted? Correct. The Treasury regulations confirm that you have the choice. So where is the egg being scrambled here? So the egg that's being scrambled is – there's no dispute that for these retirees, they were entitled to receive an annuity payment in October 2013 at their early retirement date. But it's an annuity payment. It's not a lump sum entitlement. The lump sum entitlement all comes from Amendment 1. And Amendment 1 says that the lump sum will be calculated based upon the actuarial equivalent, meaning the cost value at the time of the calculation of the accrued benefit. And these are in initial caps. These are defined terms in the plan. The accrued benefit is defined in the plan as being the normal retirement benefit. That is calculated at the normal retirement date.  and tie out the initial cap terms to the defined terms in the plan as the district court did. Well, you make that sound so simple. So what happened? I think what happened is that in the scoping memo that the administration – that the administrative person sent to the administrative team, he did not make it clear and he admitted as much in his deposition that he messed up and did not make it sufficiently clear in the scoping memo that this was, in fact, an unsubsidized lump sum benefit. Your colleague suggests that this interpretation, this what you call a misguided interpretation, was made then but then followed through at different stages of this process and that that really was the interpretation all along. So here's what we know, Your Honor. The only presentation, and this is in the record, that was made to the actual plan, the committee of the DAC pension plan, was, in fact, an unsubsidized lump sum benefit. And the calculations that were provided to them were the unsubsidized lump sum benefit. So is this the committee that adopted Amendment 1? Correct. And the breakdown occurred in the administrative implementation of the amendment. And it's also undisputed that the person who was responsible for the communication with the plan and the presentation to the plan as to the value of the lump sum and the way it should be calculated was ultimately the one who discovered, after the fact, that the calculations had been running correctly because the amounts that were paid in – You had a third-party administrator. I'm sorry, Your Honor? You had a third-party administrator. That's correct. And that's where Transamerica comes into the case, so the third-party administrator, and they're the ones that actually implement the amendment. And I think it was you, Judge Ciaz, but I apologize if I'm getting it wrong. Somebody asked, well, what effect does all that have if the plan is, in fact, unambiguous? The answer is it has no effect. You can't take credit for that question. All right. I deprived somebody of their just dues on that one. But the answer is if, in fact, the plan is unambiguous, then it is de novo review, and if it is, in fact, unambiguous, the terms of the plan must be implemented. It doesn't matter what anybody else thought or what occurred downstream in the implementation process. And just to give you some perspective, this is not a situation where there was a plan amendment, it was implemented, people were paid, and then ten years later somebody decides, you know, after a new administration of the company. We understand the timing here. That they don't like it anymore. But I think the argument from the other side is that if it is unambiguous, the way that what your administrator did demonstrates what it believed the plan provided. And then it changed its mind. And I thought that this document or a concession that they say you make in the reply brief, in your responsive brief, supported that view. I'm still not sure what that concession is or how that fits into the picture. I'm shooting in the dark a little bit, Your Honor, because I don't agree that there was any concession that would have a material impact on the outcome of the case. He talked about it enough so that I thought somebody that was intimately familiar with this case, as you are, would understand what he was talking about. Your Honor, I thought what he was talking about was that there is no dispute as to when the annuity commences under early retirement for the early retirement benefit. And there's no dispute as to when the lump sum would be payable. They were payable at the same time. The issue is the actuarial equivalent value, how you calculate it. Why don't you walk us back through, in your view, what the third-party administrator did that was wrong and how you came to fix it as you see it. So, Your Honor, what they did that was incorrect was that they calculated the lump sum benefit based upon an immediately payable annuity, the early retirement annuity. As opposed to taking normal retirement date and reducing it. Correct. That's what went wrong. And they immediately corrected it to a point that some people were not even yet paid out the lump sum benefit. Others were, and they returned the overpayment. This did not impact just these five people. It impacted a rather large number of people who were in various circumstances under the plan at the time. And everyone else has paid it back. Is there any dispute? I know your colleague indicated that even with respect to the right to elect an annuity after the correction was made, there was some mix-up with respect to the calculation. But is there any dispute that at some point all of that was cleared up and these individual retirees had the opportunity, if they wanted, to elect the annuity as opposed to the lump sum? No dispute on that at all, Your Honor. The relative value calculation for which there was an error was corrected five days later, and the folks were given an additional 60-day window in which to make their benefit election. Okay. So if they chose not to do that and litigate, it's on them? That's accurate, Your Honor. I mean, I think what should have appropriately happened here is what happened with a large number of these participants, which is that they should have paid back the overpayment so as to avoid any type of risk of excise tax, and they were warned about that in the letters. That's beside the point, but that's what should have happened. And then they should have filed a claim for benefits with the Benefit Committee, where they would assert that they, in fact, are entitled to additional benefit under the lump sum option and that they should be given the opportunity to make an additional benefit election. Those are two quintessential claims for benefits under 502A1B. Well, I have to say, though, when I read the initial letter that your third-party administrator sent to these individual retirees, I would have been offended by the nature of the letter. It had no explanation as to why the mistake had occurred and basically said pay up or else we're going to put you in collections. That's not the way, I think, to avoid litigation. So for what that's worth. I understood, Your Honor. But the point being that the participants were not without a mechanism within the plan, that is the plan's administrative process, to, in fact, contest that they believe that they have a claim for benefits. Well, what about Mr. Smith? It seems like Mr. Smith is in a bit of a different position. So just to be clear and to calibrate the court, everyone, at least based upon DAC's understanding, everyone at the Cape Fear plant was being terminated. It was a mass layoff and this lump sum benefit was being offered in connection with that layoff. Mr. Smith is in a slightly different situation in that he's claiming he could have gotten another job within DAC. Judge Flanagan found that that was too speculative because the defendant below did not provide adequate proof that there was, in fact, such a position. Well, he's got the declaration of Mr. Beck that says I'm the guy in charge of hiring and I offered him the job and I would have hired him, but he chose not to because he was getting this other benefit. Why doesn't that create a genuine issue of material fact for trial? Because I don't think, Your Honor, that there's sufficient evidence, and this is what the district court found, that there was actually a job. And we put in the declaration of Mr. Seals, who was the head of HR at the time, who was the one who was required to approve any jobs at the facility, who indicated that he had. . . And that's a fact and dispute. You've got evidence on each side, and I don't know whether this is a valid claim or not, but for purposes of summary judgment, we would have to construe this evidence in the light most favorable to Mr. Smith. The only thing I would say, Your Honor, is that you don't have any evidence, and the defendant below was never able to establish any evidence that this job was actually filled. And that's what Judge Flanagan was referring to when she said that there was not an adequate demonstration that there was actually a job here that was filled. So Mr. Beck may be absolutely correct in that it was his plan to offer the job to Mr. Smith, and that was the plan that they hatched, but the defendant below never established that there was actually such a job and that it was filled. And it's against the backdrop of Mr. Smith, who received a substantial separation payment in connection with his termination. It's north of $100,000. And who would not have been eligible for the lump sum benefit if, in fact, he did not take the election. What is also absent in the record is any type of demonstration of harm that, in fact, in light of the revised benefit calculation, he went out and looked for some other job or somehow thought that he needed some other employment. It's completely absent in the record. So I think the finding below and the position for which we would advocate is that there just isn't sufficient evidence that there, in fact, was a position that Mr. Smith could have filled. And at the end of it all, Judge Aguirre, you're left with a very difficult situation of what would... Well, Mr. Smith says I have forgone substantial earnings and benefits that I would have received had I accepted the transfer position in South Carolina. Why doesn't that create a factual dispute to be determined prior to fact? Because I think the defendant below needed to actually establish that there was such a position. They established that Mr. Beck and Mr. Smith talked about such positions, but they never established that there was such a position. And we put in an affidavit that indicated that DAC's records reflect no such position and that the head of Human Resources, who was responsible for making that determination, has no recollection of ever having improved a position. Well, listen, Mr. Beck says that there were two positions within my purview opened and I placed advertisements to attract these candidates and that Mr. Smith, I offered him the job. So maybe Mr. Beck didn't have the authority to do any of this, or maybe the jury wouldn't believe Mr. Beck. But it seems to make something of a case that there was a job there and it was open and that he was offered it and he turned it down because of the representations with regard to his retirement benefits from the defendant. And the distinction I'm making, Your Honor, is that in the face of the seals declaration, which is from the Human Resources person who would be responsible for actually approving the transfer, that there was no, he has no recollection of approving any transfer for that position and they had no record of that position. So that, I think, is where the breakdown is, Your Honor. So what does this sentence mean? This is from the district court's opinion. Smith admits that DAC never offered me the job, that I declined in reliance on the original representations about the lump sum amount. Your Honor, I apologize. I had a little bit of trouble hearing you. I'm sorry. I'm quoting from the district court opinion at JA-41. Smith admits that DAC, or the opinion at 41, Smith admits that DAC never offered me the job, that I declined in reliance on the original representations about the lump sum amount. That purportedly is quoting DE-131 paragraph 122, or 22. What does that mean? I think what the judge below is attempting to articulate is that he was not able to establish any causation that, in fact, he did not get a job because of his decision as to the pension overpayment. DAC never offered me the job, that I declined in reliance on the original representations about the lump sum amount. I just don't understand what that means. I think what she's – I think what the judge below was saying is that – Okay. I'll ask your colleague. Maybe he knows the answer to that. Okay. Let me just pull that real quick, Your Honor. That's fine. You don't – don't worry about it. You have only a few seconds. No? You better wind up. Your Honors, the only final point I would make is with respect to the amendment of the judgment, it should be an abuse of discretion standard. There was, in fact, a second benefit election that was offered with the correct information, and procedurally the appellants have waived a third, now third, election, and that the district court's opinion should be upheld on all counts and that the plan assets that properly belong in good conscience to the plan should be returned by these appellants just as it was returned by all other participants in the plan who received or were informed of a pension overpayment. And we would ask that the court affirm the district court's opinion. Thank you. Thank you, Your Honors. Thank you. And if I misspoke, I apologize. As I look back in the briefing from my colleague, I don't see even a reference to BCT date. He uses the – they use the term immediately. But if you look at what his client has represented, the – So there isn't this smoking gun admission in the – is that right? I'm getting there. Okay. There is, Your Honor. If you look at it, it's in the record. It's on page 201. And this is the December 16th – 201 of the appendix? Yes, sir. And it's also referenced on page 41 of our original brief. And what we were citing to is the final correctional letter that was sent by Transamerica to these particular folks. And Mr. Bryan, again, has used it as the example. And it's a letter dated December 16th, 2013. And this letter goes out to describe to Mr. Bryan, and as Judge Diaz pointed out, they finally gave him the information as to what benefits they qualified for. And in this particular letter, it says the benefit commencement date is October 1st, 2013. And that's the same benefit commencement date that they use in the calculation, showing Mr. Bryan this is what you'll get if you pick an annuity, and this is what you get if you pick a lump sum. So unless counsel for the appellees now is going to refute the admission of his own clients based on what they're contending is the corrected election form, then I believe it's an admission that the BCD date is October 1st, 2013. And, again, if you go back and look at the briefing, they continue to use the word immediate, and the word immediate in the amendment means October 1st, 2013. So how does that help you in calculating the benefit? Because as counsel, as my colleague had said, they believe it shouldn't be an equivalent cost value. It should be less. If you pick the lump sum, you get less. Well, if you go and you look at the amendment, it doesn't say that. It simply says you get an actual equivalent of your accrued benefit. Accrued benefit, again, is your starting point. You start at accrued benefit, and then you figure out what distribution form you have, and then you figure out what your BCD date is, and they're saying it's October 1st. So if you've got, if they're offering two, these clients only qualify for two things. They qualify for a single life annuity, and they qualify for lump sum benefit. According to the amendment one, they have to be equivalent cost value. They qualify for the lump sum benefit because of amendment number one. I'm sorry, Your Honor? They qualify for the lump sum because of amendment number one. Absolutely. So I'm still not getting how what's on page 201 changes the benefit calculation. I don't think opposing counsel quarrels with when the benefit would commence, but that doesn't tell you anything about how you calculate it. Well, according to their client, it does. According to the letter they sent to Mr. Bryan on December 16th, the language they used is the original lump sum was calculated as the actual present value. What are you looking at now? I'm sorry. This is the record side of 201-202. Okay. All right. So you're reading from which page? From which? 202. Excuse me. It's right on the top there. It's actually the second paragraph on the top. It starts, the original lump sum was calculated as the actual present value at your BCD of your single life annuity as shown in section E of your retirement benefit application. And here's the operative language they added after the fact. Commencing at your BCD. Oh, I'm sorry. I'm reading the wrong one. It's the paragraph before that. They're saying the current, they're saying that's what they did originally. The first paragraph, the second paragraph, or the third paragraph? First paragraph. The second paragraph is telling Mr. Bryan what they did originally. They're saying, hey, we used your BCD date to start your lump sum present value calculation. Then you go up to the first paragraph, and they're saying this is what we should have done. What we should have done, it says, and they bolded it. They're saying we should have calculated your total monthly accrued benefit commencing at your NRD, your normal retirement date. That's the language that should have been in Amendment 1, commencing at. And if you go and you look at the other different benefit options in the plan. Did you just derive that from the definitions in the plan? Commencing at your NRD? That's when the payment would start. I don't see how this is helping you contradict the calculation of the benefit. Well, it does contradict because that language, commencing at your NRD, is not in Amendment 1. That language isn't there. And going back to your question, Your Honor, when you're asking. Well, I think their position is it doesn't have to be because it's in the plan. Well, it wouldn't be equivalent cost value. You have to compare the two options being provided to these particular participants, and they have to be equivalent cost value of the plan. Your argument is that, as I understand it, your argument is that the lump sum and the annuity payments must be equal, not that the lump sum is actuarially equivalent to the annuity payments. What you just said, it's saying the same thing. It has to be the same cost value to the plan. So our clients, they could have chosen right away, we want the annuity. And that annuity would have started October 1, 2013. The amendment allowed them to also pick a lump sum, which would start on October 1, 2013. The actuarial equivalent definition requires that those two options are the same cost of the plan. I mean, that goes back to what harm is here. I mean, there is no harm to the plan because if our clients, if you rule in our favor and our clients are allowed to keep what was provided to them, it's the same cost of the plan because if they chose. I don't think that's what the Treasury regulations contemplate. There's no incentive on behalf of a plan sponsor to offer something that's subsidized in one form, which is the annuity, which the code requires, but unsubsidized in the other form, which is the lump sum that the plan admits and which the Treasury regulations say you're specifically permitted to do that and it doesn't offend the code requirements for actuarial equivalent. You're correct, but you've got to do it correctly. The Treasury regulations don't require that you get a discount on the plan. That's one option. You can do it that way, absolutely. We don't dispute that, but you have to do it properly. Well, I think you're correct if what you're saying is that the plan would have, the amendment would have been better off had it explained what it meant in the letter that you just read. Absolutely. But that's not necessarily required so long as the language of the amendment accomplishes the same objective. And what I heard your opposing counsel say is that if you look to the definitions of the plan for accrued benefit and the like, that effectively means the same thing as what they say it means in this letter. But what he didn't answer is if you accept that argument, then how do you explain, for instance, deferred normal retirement? Deferred normal retirement has the phrase accrued benefit and at your normal retirement date. So if all you have to say is accrued benefit equals normal retirement date, you would go to a definition of plan that doesn't, it has extra words in it. You can't read it that way. When they drafted that section of the plan, I believe they meant they wanted to give effect to every word they put in the plan. So if you accept their current argument, which is accrued benefit equals normal retirement date, you don't need those additional words. And if you go to look at what the Labor Secretary said is, and it cautioned plans, it said, look, if you want, as you said, Your Honor, if you want to do a lump sum and you want to do it at a discount, you know, not provide a subsidy, we're telling you what you should do is provide that clear language in your amendments when you do that. They didn't do that here. And if you read the amendment, it means that it starts immediately. The word immediately is right in the amendment. These guys get that. Well, even if they didn't, what the Labor Department has suggested is simply that, a suggestion. It's not in the regulations and it's not required. That's correct. I mean, the analogy I would say, Your Honor, it's like OSHA coming into your plan saying, hey, we think you should do that. It's a pretty good indication that you should do it that way to do it properly. They didn't do it properly. That's the problem here. If that was their intent originally, to do this at a discount, they needed to add proper language in there to notify all the participants that this is the way we're going to do it, just like they finally did in the letter after the fact. Your clients wouldn't ordinarily be entitled to a lump sum, right? Correct. So this was a benefit, giving them any entitlement to a lump sum? Absolutely. I think my time is up. Yes, you're right. Troubles with the time. Thank you very much. That's the only rebuttal we have? Yes. All right. We will take a break. I'm fine if you want to take two minutes. Okay. We will come down and greet the lawyers and then we'll take a short recess.
judges: Diana Gribbon Motz, G. Steven Agee, Albert Diaz